UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENT MCPHERSON, Individually and on Behalf of Others Similarly Situated, | § § § | |
| Plaintiff, | § | Civil Action No. 4:14−cv−02361 |
| v. | § § | |
| LEAM DRILLING SYSTEMS, LLC and REME, LLC, | § § § | |
| Defendants. | § § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND FOR NOTICE TO PUTATIVE CLASS MEMBERS**

Plaintiff Brent McPherson's Motion for Conditional Certification and for Notice to Putative Class Members (the "Motion") should be denied because McPherson has proffered no reliable evidence to establish that he is similarly situated to the members of the putative class that he seeks to represent. Indeed, the evidence attached to McPherson's Motion consists of three substantively identical and conclusory declarations that both McPherson and opt-in plaintiff Patrick Blake have subsequently admitted contain sworn statements that are, in fact, false.

Moreover, even if the Court accords some weight to McPherson's suspect evidence, Defendants have affirmatively established through the seven (7) declarations attached to this response that McPherson is not similarly situated to the members of the putative class—many of whom, unlike McPherson, earned well over $100,000 a year and performed managerial and supervisory duties. Thus, it is beyond dispute that different potential defenses and exemptions, including the highly compensated exemption, will apply to these members of the putative class and not to other members of the putative class, like McPherson. Accordingly, judicial efficiency will not be furthered by trying these disparate claims and defenses together in one lawsuit, and conditional certification should be denied as a result.

# I.
# BACKGROUND

REME, LLC employed McPherson as a Measurement While Drilling Engineer ("MWD") from March 15, 2011 to January 25, 2012.  *See* Doc. No. 9 at Exhibit A ¶ 2.  In his Motion, McPherson seeks to conditionally certify a nationwide class of all "drillers" and "operators"[1] employed by LEAM and REME within the past three years.  *See* Doc. No. 36 at 1.  McPherson argues that conditional certification is "more than appropriate" in this case because the more than 1,000 DDs and MWDs whom he seeks to represent are all "similarly situated in terms of their job titles, duties, and compensation."  *See id.*

In support of this sweeping proclamation, McPherson relies upon his own declaration and the declarations of Blake and Shane Murphy, two other MWDs.  The declarations of McPherson and Murphy are identical, word-for-word, except for the names of the declarants and the date of execution.  *See id.* at Exhibits 1 & 2.  Blake's declaration is also substantively a mirror image of the declarations of McPherson and Murphy, with the exception that Blake swore "under the penalty of perjury" that he "was employed as a Directional Driller ("Driller") for LEAM."  *See id.* at Exhibit 3.

Blake subsequently recanted this sworn statement during his deposition, however, and admitted that he only worked as an MWD while employed by REME.  *See* Excerpts from Blake's deposition attached as Exhibit A at 14:5–6.  When questioned about this inconsistency,

---

[1]      Neither REME nor LEAM Drilling Systems LLC ("LEAM") has ever employed anyone with the job title of "driller" or "operator."  At all times relevant to this litigation, REME has employed MWDs and LEAM has employed Directional Drillers ("DDs").  Doc. No. 9 at Exhibit A ¶ 5.  For purposes of this Response, REME and LEAM will use the terms MWDs and DDs to describe the persons whom McPherson seeks to represent.

Blake testified that the inclusion of the wrong job title in the very first sentence of his own sworn statement was a mere "typo."[2]  *See id.* at 61:6–25.

McPherson also recanted material portions of his sworn declaration during his deposition. Specifically, McPherson swore in his declaration that "[b]ased on [his] experience as an employee of Defendants and conversations with other Drillers and Operators employed by Defendants, I know we all perform the same general duties . . . ."  Doc. No. 36 at Exhibit 1 ¶ 8 (emphasis added).  At his deposition, however, McPherson repeatedly admitted that he has no idea what job duties the DDs at LEAM perform:

> Q.  (By Ms. Moll) There are only directional drillers at LEAM.  So what are the job duties of a directional driller at LEAM.
>
> A.  I wasn't one.  I couldn't tell you.

Excerpts from McPherson's Deposition attached as Exhibit C at 37:18–22.

> Q.  You don't know what DDs do, do you?
>
> A.  No ma'am.

*See id.* at 65:5–6.

> Q.  You don't know what a DD is in charge of, do you?
>
> A.  I understand what a DD is, but specifically at LEAM, no, I don't know what their job duties are.

*See id.* at 106:10–12.

McPherson further declared that he knows "based on his conversations with Drillers" that they "would participate in a lawsuit to recover unpaid overtime compensation."  *See* Doc. No. 36

---

[2]     Interestingly, counsel for McPherson, while emphatically arguing at the Initial Conference that "there's no need" for the depositions requested by REME and LEAM, represented to the Court that "[w]e do have a directional driller in the case.  His name is Mr. Blake.  To say that we don't have a representative group is just materially false." *See* Transcript of Initial Conference attached as Exhibit B at 5:16 – 25; 12:4–14 (emphasis added).

at Exhibit 1 ¶ 12.  McPherson admitted during his deposition, however, that he has not spoken to any DDs about joining this lawsuit:

> Q.    What directional drillers have you talked to that you know would participate in this lawsuit if they were given the opportunity?
>
> A.    I haven't talked to any of them about it.

*See id.* at 82:15–18.  In short, not only are the declarations attached to McPherson's Motion unreliable because they are identical, boilerplate, and conclusory, they should be accorded no weight because they contain material misstatements.[3]

On November 17, 2014—the deadline to amend pleadings and roughly 20 days after the above testimony was elicited—McPherson filed an "Unopposed" Motion for Leave to File Plaintiff's Second Amended Collective Action Complaint.  Doc. No. 62.  In his second amended complaint, McPherson drops the DDs from the putative class—none of whom have opted into the lawsuit anyway.  *See* Doc No. 65..  Then, on November 21, 2014 at 11:53 a.m.—the due date of this Response—McPherson filed a "Notice" with the Court stating that he was no longer seeking to represent the DDs.  *See* Doc. No. 63.  This so-called "Notice," however, does not in any way constitute a valid amendment to McPherson's Motion.

Thus, the reality is that McPherson has neither amended his Motion to reflect that he is no longer seeking to represent the DDs nor supplemented or corrected his declaration or the other declarations attached to his Motion.  Accordingly, McPherson is apparently now asking the Court to certify a nationwide class of over 500 MWDs employed by REME over a three-year period based solely upon allegations contained in an outdated Motion supported by identical,

---

[3]    During his deposition, McPherson conceded, for the first time, that he is no longer seeking to represent DDs in this suit.  *See* Exhibit C at 51:12-14, 78:8-11.  Also, McPherson admitted that despite what he alleges in his First Amended Class and Collective Action Complaint at Paragraphs 15–18, he does not know what policies the DDs are issued, what policies they are expected to follow, whether they have a manual, what paperwork they are required to complete, what tools they use, or what equipment they use on the job site.  *Id.* at 131:15-132:15; *See* Doc. No. 14 at ¶¶ 15-18.

conclusory declarations that contain statements the declarants themselves have admitted are false.   Certainly there is no evidentiary standard "lenient" enough to warrant conditional certification under these circumstances.

Notwithstanding the above evidentiary deficiencies, the Court should deny conditional certification of an MWD only class because McPherson is not similarly situated to the class of MWDs that he seeks to represent.  REME employs five different levels of MWDs.  As detailed below, there are vast differences between the job responsibilities of and the compensation earned by the lower level MWDs, like McPherson, and the more senior MWDs.  Indeed, the more senior MWDs, unlike McPherson, almost all earn well over $100,000 annually, train and supervise lower-level MWDs, have substantial influence on decisions relating to the promotions of lower-level MWDs, have the authority to bind REME on matters of importance, and exercise a great deal of discretion in performing their daily job duties.

Given these differences in job responsibilities and compensation, different defenses and exemptions—including the highly compensated exemption—will apply to some members of the putative class that McPherson seeks to represent and not to others.  It will therefore be inefficient and impractical to try this matter as a representative action.   Accordingly, conditional certification of this ad-hoc MWD only class that McPherson is now attempting to salvage should be denied.

## II.
## FACTS

REME employs five different levels of MWDs: (1) the MWD Trainee, also known as an MWD I; (2) the Night MWD, also known as an MWD II; (3) the Break-Out Lead MWD, also known as an MWD III; (4) the Lead MWD, also known as the MWD IV; and (5) the Senior Lead MWD, also known as the MWD V.  *See* Declaration of Kevin Parrack attached as Exhibit D at ¶

3. MWDs generally work in two man crews that consist of either an MWD Trainee or Night MWD, who is more junior, and a Lead or Senior Lead MWD, who is more senior and is responsible for leading the job. *See id.* at ¶¶ 4, 6, 9. This is not always the case, however, as there are jobs on which a Lead MWD will supervise and oversee the work of two junior MWDs. *See* Declaration of Beau LeBoeuf attached as Exhibit E at ¶ 4.

**1.      Senior MWDs Train and Supervise Junior MWDs**

Lead and Senior Lead MWDs are generally expected to train the lower level MWDs with whom they are assigned to work. *See* Exhibit D at ¶¶ 4, 6, 9; Declaration of Brodderick Massad attached as Exhibit F at ¶ 7 ("One of my primary job duties as a Lead MWD is to train the MWD Trainees and the Night MWDs who are assigned to my crew."); Declaration of Roy Lum attached as Exhibit G at ¶ 7; Declaration of Alan McCarley attached as Exhibit H at ¶ 3; Declaration of Gregory Loinette attached as Exhibit I at ¶ 7. This training involves, among other things, directing the lower-level MWDs on how to set up all of the equipment on the job, teaching them how to log the well being drilled, and showing the lower level MWDs how to identify and resolve common issues faced by MWDs. *See* Exhibit F at ¶ 7; Exhibit G at ¶ 7.

Further, Lead MWDs and Senior Lead MWDs supervise and direct the work of the lower-level MWDs who work under them. *See* Declaration of Brian Christopher Jones attached as Exhibit J; Exhibit G at ¶ 7; Exhibit H at ¶¶ 3–4; Exhibit E at ¶ 4; Exhibit I at ¶ 7. Indeed, according to Lead MWD Beau Leboeuf, "I am responsible for coordinating the job from start to finish," and "I instruct and direct the lower-level MWDs on how to and where to set up the equipment while I program the computers and the MWD tool." Exhibit E at ¶ 4; *see also* Exhibit J at ¶ 5 ("As the Senior Lead MWD, I am responsible for everything concerning the MWD side of any particular job and, as a result, I am supervising the night hands on all aspects of MWD

operations including taking surveys, preparing data for the client and email correspondence, and changing out tools, amongst other things.").

Additionally, some Break-Out-Lead MWDs start leading jobs and training and supervising lower-level MWDs before being fully promoted to the position of Lead MWD.  *See* Exhibit H at ¶ at 3.  In no event, however, is an MWD Trainee or a Night MWD responsible for training or supervising another MWD.  *See* Exhibit D at ¶ 6.

## 2.    More Senior MWDs Complete Performance Reviews and Make Recommendations Regarding Promotions

The Lead and Senior Lead MWDs complete written performance evaluations on the lower-level MWDs who they supervise.  *See* Exhibit D at ¶ 11; Exhibit E at ¶ 8; Exhibit F at ¶ 8; Exhibit G at ¶ 8; Exhibit H at ¶ 4; Exhibit I at ¶ 7; Exhibit J at ¶ 7.  These performance evaluations are called MWD Field Assessments.  *Id.*  In the assessments, the more senior MWDs evaluate the performance of the lower-level MWDs and assess the lower-level MWDs' strengths and weaknesses.  *See Id.*  Neither the MWD Trainees nor the Night MWDs complete these evaluations.  *See* Exhibit D at ¶ 11; Exhibit F at ¶ 9; Exhibit I at ¶ 7.

The Lead and Senior Lead MWDs provide the MWD Field Assessments to the MWD Coordinators, and the assessments are "strongly taken into consideration" and "given a lot of weight" when decisions are being made regarding whether to promote an MWD to the next level.  *See* Exhibit D at ¶ 11; Exhibit E at ¶ 8 ("I have been told by my coordinator that he makes promotion decisions and awards pay raises based on the information in the MWD Field Assessments.").

Notably, Blake completed an MWD Field Assessment of McPherson when Blake was a Lead MWD and McPherson was a lower-level MWD.  *See* MWD Field Assessment of McPherson attached as Exhibit K.  In the assessment, Blake noted that McPherson was "very

coachable" and that he "did not seem to [have] any difficulty with the tasks once given instruction." *See id.* Blake also commended McPherson for reaching a "heads up" solution to a problem they encountered on the job. *See id.*

Additionally, more senior MWDs often recommend the more junior MWDs who they are supervising for promotions. *See* Exhibit J at ¶ 7 ("As a Senior Lead MWD, I make promotion recommendations all the time and my word on this matter is given lots of weight."). The MWD Coordinators also contact the more senior MWDs in the field to obtain recommendations regarding whether certain MWDs are qualified and experienced enough to be promoted to the next level. *See* Exhibit F at ¶ 10; Exhibit H at ¶ 4. For example, since the time that Lead MWD Alan McCarley was promoted to the position of Break-Out Lead MWD, his coordinator has asked him for his "opinion about the lower level MWDs who [he] works with" and has "also ask[ed] [him] for [his] recommendation when determining whether to provide the lower-level MWD who [McCarley] supervises a promotion or a raise." *See* Exhibit H at ¶ 4.

**3.     Lead and Senior Lead MWDs Have the Authority to Discipline Lower-Level MWDs**

Lead and Senior Lead MWDs have the authority to discipline lower-level MWDs. *See* Exhibit E at ¶ 11 ("I have the authority as the Lead MWD to discipline the MWD Trainees and Night MWDs that work under my supervision."). One means by which more Senior MWDs discipline lower-level MWDs is by having them removed from a job. *See* Exhibit J at ¶ 4; Exhibit F at ¶ 6. For example, Senior Lead MWD Chris Jones has unilaterally removed six or seven more junior MWDs from different jobs during his employment with REME. *See* Exhibit J at ¶ 4. He has removed these individuals from the job for various reasons, including his perception that a lower-level MWD either lacks interest in performing his job duties or has an inability to wake up to perform such duties. *See id.* Jones does not ask anyone for permission

when determining, in his sole discretion, to discipline a lower-level MWD by removing him from the job.  *See id.*

Similarly, Lead MWD Brodderick Massad has recommended to his coordinator on several occasions that a lower level MWD be removed from the job.  *See* Exhibit F at ¶ 6.  On one such occasion, Massad was pulling the MWD tool out of the hole and had to ask the rig crew for assistance because the Night MWD who he was supervising at the time chose to merely sit back and watch.  *See id.*  According to Massad, "[c]arrying and cleaning the MWD tool are generally the duties of the Night MWD in [his] experience, and [his] job as the Lead MWD is to then break the tool down and reprogram it."  *See id.*  Accordingly, Massad contacted his coordinator and had the lower-level MWD removed from the job.  *See id.*

### 4.  Lead and Senior Lead MWDs Exercise Discretion in Performing Their Job Duties

Lead and Senior Lead MWDs are expected to rely on their experience in the field and exercise their discretion to quickly identify and resolve problems to avoid costly delays in the drilling process.  *See* Exhibit G at ¶ 16; Exhibit F at ¶ 5; Exhibit I at ¶ 6; Exhibit J at ¶ 6.  MWD Trainees generally seek the assistance of the more senior MWDs on the job and rely on their guidance and expertise to troubleshoot problems, but as an MWD advances and begins to lead jobs, he is expected to be able to start resolving issues without guidance from the coordinator or anyone else.  *See* Exhibit G at ¶ 15; Exhibit H at ¶ 3; Exhibit J at ¶¶ 8–9; Exhibit I at ¶ 5.

Further, "[t]here are no established procedures for troubleshooting a problem" that may arise "because there are a number of things that can go wrong and the solution depends on the problem at hand."  *See* Exhibit G at ¶ 16.  Thus, while REME does have an MWD manual, "[n]o manual addresses all of the issues presented on a job, so it comes down to what I know about the rock formation, the quality of the drilling mud being used by the operator, my knowledge of the

9

other pumps or electronic equipment around the drill site and my understanding of how to interpret surveys to ensure they are within tolerance." *See* Exhibit I at ¶ 6.  In fact, some of the more senior MWDs have "never used" the MWD manual to perform their job duties.  *See* Exhibit J at ¶ 10.  Additionally, the region of the country in which the MWDs are working as well as the operator for whom they are working can have an effect on the job duties the MWDs perform and the frequency with which certain job duties must be performed.  *See* Exhibit E at ¶ 6; Exhibit F at ¶ 5; Exhibit G at ¶ 13; Exhibit I at ¶¶ 4–5.

**5.      Lead and Senior Lead MWDs Have Authority to Bind the Company**

Lead and Senior Lead MWDs are authorized to execute Railroad Commission Reports on behalf of REME at the completion of the drilling of a well.  *See* Exhibit D at ¶ 12; Exhibit F at ¶ 13.  The reports are filed with state administrative agencies and the MWD who signs the report is certifying that he oversaw and took the surveys of the newly drilled well and that the surveys are accurate.  *See id.*  The reports are legally binding upon REME and neither an MWD Trainee nor a Night MWD is authorized to execute the reports on behalf of REME.  *See* Exhibit D at ¶ 12; Exhibit F at ¶ 13 ("The Railroad Commission Report is legally binding on REME, so I take the report very seriously.")

**6.      Lead and Senior Lead MWDs are Highly Compensated Employees**

Most Lead and Senior Lead MWDs earn over $100,000 a year in annualized salary while the more junior MWDs generally do not.  *See* Exhibit D at ¶ 13; Exhibit I at ¶ 3 (As a Lead and a Senior Lead MWD "I earned over <u>$121,000</u> in 2013 and I am on pace to earn roughly <u>$175,000</u> this year.") (emphasis added); Exhibit E at ¶ 3; Exhibit F at ¶ 3; Exhibit G at ¶ 6; Exhibit J at ¶ 3.

For example, Blake earned <u>$91,169.97</u> while working as a Lead MWD from early January of 2011 through the date he quit his employment on or about September 29, 2011, which

equates to an annualized salary of roughly $124,758.90.  *See* Blake's Form W-2 attached as Exhibit L.  By comparison, McPherson earned $49,887.96 while working as a more junior MWD from the date that he was hired on or about March 15, 2011 until the end of 2011, which equates to an annualized salary of $63,272.53.  *See* McPherson's W-2 attached as Exhibit M; Exhibit C at 48:11–50:11.  It is worth noting, however, that McPherson earned $14,763.14 while working as a Lead MWD during the final month of his employment with REME in January of 2012, which equates to an annualized salary of roughly $177,157.68.  *See id.*

## III.
## LEGAL STANDARD

29 U.S.C. § 216(b) of the FLSA permits an employee to bring an action "for and [on] behalf of himself . . . and other employees similarly situated."  In determining whether a plaintiff has established that he is "similarly situated," the majority of courts in the Southern District of Texas apply the two-stage certification process established in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).  *See Nieddu v. Lifetime Fitness, Inc, LTF Club*, 977 F. Supp. 2d. 686, 690 (S.D. Tex. 2013).

Stage one under *Lusardi* usually occurs before substantive discovery has been conducted, and thus the Court looks only to the pleadings and accompanying affidavits to make a preliminary determination of whether the plaintiff has satisfied his burden that he is similarly situated to other members of the proposed class.  *See Rodriguez v. Gold & Silver Buyers, Inc.*, No. 4:12-CV-1831, 2013 WL 5372529, at *5 (S.D. Tex. Sept. 24, 2013) (J. Harmon).  Although the standard to satisfy the burden at stage one is "lenient," the "Court still requires 'substantial allegations' that the putative class members are similarly situated to the plaintiffs with regard to job requirements and pay provisions."  *See id.* at *6.  At stage two, discovery has largely been completed and the defendant has filed a motion to decertify, whereupon the Court will conduct a

11

fact-intensive review to determine if the putative class members are similarly situated.  *See Nieddu*, 977 F. Supp. 2d. at 690 (S.D. Tex. 2013).

This Court has also recognized an intermediate stage, however, when the parties have had the opportunity to conduct some discovery.  *See Blake v. Hewlett-Packard Co.*, No. 4:11-CV-592, 2013 WL 3753965, at *2 (S.D. Tex. July 11, 2013).  At the intermediate stage, the court "imposes a heightened evidentiary standard" under which the plaintiff is required to support his motion with "more than minimal evidence."  *See id.*

## IV.
## ARGUMENT

It is McPherson's burden to establish that he is similarly situated to the individuals he seeks to represent.  *See Nieddu*, 977 F. Supp. 2d. at 690.  To satisfy this burden, McPherson must set forth "'substantial allegations' that the putative class members are similarly situated to [him] with regard to job requirements and pay provisions."  *See Rodriguez*, 2013 WL 5372529, at *6. McPherson took this so-called "lenient" burden at stage one for granted, however, and failed to submit any reliable evidence along with his Motion to warrant conditional certification.  This is the case irrespective of which evidentiary standard this Court applies.

Moreover, notwithstanding the fact that McPherson cannot satisfy his burden in the first instance, Defendants have proffered substantial evidence showing that McPherson is not similarly situated to the class of MWDs he seeks to represent in terms of the job duties they performed and the compensation they earned.  These differences will result in different defenses and exemptions being applicable to the claims of certain members of the putative class and not other members of the putative class—namely, the highly compensated MWDs.  Given this fact, there is no basis upon which McPherson can establish that a collective action will promote judicial efficiency in this matter as individualized factual assertions and defenses will

predominate over any collective considerations.  Accordingly, conditional certification should be denied.

**A.     McPherson has Failed to Set Forth Any Credible Evidence to Establish that He is Similarly Situated to the Class of Individuals He Seeks to Represent.**

As an initial matter, McPherson purports to have "more than met" his burden of showing that he is similarly situated to a putative class of both DDs and MWDs based upon his pleadings and his attached declarations.  *See Doc.* No. 36 at pp. 2, 13.  Despite McPherson's counsel's objections at the Initial Conference, however, the Court allowed Defendants to depose McPherson and Blake for four hours each regarding issues bearing upon conditional certification.  *See* Exhibit B at 7:15–19 (stating that "I think what concerns us is that this is one of about 40 cases that we've got involving identical issues" and "[t]here is simply nothing that's unique about this case that would justify these Defendants to engage in whatever this targeted or limited discovery is.")  During his deposition, however, McPherson essentially admitted that a number of the allegations in his sworn declaration were false.

Indeed, McPherson swore under the penalty of perjury in the course of a two-page declaration executed on July 24, 2014: (1) that MWDs and DDs "all perform the same general duties;" (2) that based on his experience and "conversations with [DDs]" they, like MWDs, "do not supervise or otherwise oversee the work of any persons in the course of their jobs;" (3) that DDs and MWDs carried out their duties "in accordance with strict, well established policies;" and (4) that "based on [his] conversations with other [DDs] . . . if given the opportunity . . . these individuals would participate in this lawsuit to recover unpaid overtime compensation."  *See* Doc. No. 36 at Exhibit 1 ¶¶ 8, 9, 10, & 12.

McPherson then recanted each of these sworn statements during his deposition a mere three months later and admitted that he does not know what job duties the DDs perform:

> Q.    You don't know what DDs do, do you?
>
> A.    No ma'am.

See Exhibit C at 65:15–16; that he never had any "conversations" with DDs regarding who they supervise:

> Q.    I'm asking not about conversations in general.   I'm asking about conversations about who they supervise.   Did you have those conversations with directional drillers?
>
> A.    No, ma'am.

See id. at 82:11–14; that he does not know what "strict, well established policies" DDs use, if any, to carry out their duties:

> Q.    Do you know what policies the DDs are issued?
>
> A.    No ma'am.
>
> Q.    Do you know what policies [DDs] are expected to follow?
>
> A.    I don't know.

See id. at 131:15–18; and that he never had any "conversations" with DDs regarding joining this lawsuit:

> Q.    What directional drillers have you talked to that you know would participate in this lawsuit if they were given the opportunity?
>
> A.    I haven't talked to any of them about it.

See id. at 82:15-18.

Blake's declaration is equally, if not more, concerning given the circumstances. Specifically, Blake, in the course of trying to obtain conditional certification of a class of DDs and MWDs, swore unequivocally in his declaration that he was "employed as Directional Driller ("Driller") for LEAM."  See Doc. No. 36 at Exhibit 3 ¶ 1.  This would have made Blake the only DD to have opted into the putative class, yet Blake then admitted during his deposition that he

was at all times employed by REME as an MWD and relegated the material misstatement of his

job title to a mere "typo:"

> Q.    Okay.  And what was your job at REME?
>
> A.    It was MWD.

*See* Exhibit A at 14:5–6.

> Q.    Okay.  So instead of what you signed, which is, I was employed as
>        directional    driller, paren, driller, it was supposed to say, I was
>        employed in directional drilling?
>
> A.    Yes, sir.  That's correct.
>
> Q.    Why did you sign it without it being corrected?
>
> A.    It was just a typo.

*See id*. at 61:20–25.  Moreover, Blake also admitted—contrary to the sworn statements in his

declaration—that MWDs and DDs do different jobs (56:13–21); that he does not, in fact, know

whether DDs are subject to the same pay practices as MWDs (77:6–13); and that he does not

know what "well established" polices DDs follow, if any, to carry out their job duties (77:14–

21).

McPherson would now have the Court merely disregard and excise the false statements in

his sworn declarations and in his Motion pertaining to DDs as a result of his attempt to again

amend his Complaint, while still asking the Court to give credence to the remaining allegations

in his declaration pertaining to MWDs.  Indeed, at the end of the day, the same defective proof

that McPherson attached to his Motion in seeking to conditionally certify a class of DDs and

MWDs is still the only proof before the Court with respect to any attempt to conditionally certify

an MWD only class.  This proof again consists of three declarations that are identical, word-for-

word, other than the declarants' names, the dates on which the declarations were signed, and

Blake's false and subsequently recanted testimony that he worked for LEAM as a DD.  *See* Doc.

No. 36 at Exhibits 1–3; Exhibit A at 61:6–25.

Presented with evidence similar to that which is at issue in this case, an appeals court in

California recently affirmed the trial court's decision to accord identical, form declarations no

weight and stated as follows:

> Form declarations present a problem.  When witnesses speak exactly the same
> words, one wonders who put those words there, and how accurate and reliable
> those words are.  There is nothing attractive about submitting form declarations
> contrary to the witnesses' actual testimony.  <u>This practice corrupts the pursuit of
> truth.</u>

*See In re Walgreens Co. Overtime Cases*, No. B230191, 2014 WL 5390402, at *5 (Cal. Ct. App.

Oct. 23, 2014) (emphasis added).  This Court has likewise previously denied conditional

certification, in part, because the only declaration submitted by an opt-in plaintiff was "virtually

identical" to the plaintiff's declaration and "<u>therefore add[ed] very little to support [the

plaintiff's] allegations.</u>"  *See Vasquez v. American Bor-Trench, Inc.*, No. 4:12-CV-3181, 2014

WL 297414, at *4 (S.D. Tex. Jan. 23, 2014) (J. Harmon) (emphasis added).  Moreover, in

addition to being identical, the declarations consist of nothing more than conclusory and

unsupported allegations, none of which are sufficient for McPherson to meet his burden and

warrant conditional certification of a nationwide class of MWDs.  *See Rodriguez*, 2013 WL

5372529, at *6 (noting that "unsupported assertions of widespread FLSA violations . . . will not

satisfy the movant's 216(b) burden" and denying conditional certification because "[a]ll

<u>Plaintiffs have done to satisfy their burden is to submit boilerplate affidavits with conclusory

unsupported allegations.</u>") (emphasis added).  Conditional certification should be denied as a

result.

**B.      The MWDs McPherson Seeks to Represent are Not Similarly Situated With Respect to Job Duties and Compensation.**

"A number of courts have refused to certify a class, even conditionally, when determining whether the employer improperly treated the plaintiffs as nonexempt would require a highly individualized, fact intensive inquiry." *See Aguirre v. SBC Comm's, Inc.*, No. Civ. A. H-05-3198, 2006 WL 964554, at *7 (S.D. Tex. Ap. 11, 2006) (J. Rosenthal) (denying conditional certification because the plaintiffs failed to make "even a minimal showing that all [putative class members] perform the same type of work or exercise the same amount of discretion."). This is so because the purpose of conditional certification is to promote judicial efficiency, and trying factually disparate claims to which different defenses will be applicable in the same lawsuit is the antithesis of efficient. *See id.* ("Because the exempt or non-exempt status of the opt-in plaintiffs would need to be determined on an employee-by-employee basis, litigating this case as a collective action would not be efficient."). Such is the case here.

Indeed, the majority of the Lead and Senior Lead MWDs in the putative class earned over $100,000 a year during the relevant time period. *See* Exhibit D at ¶ 13. As such, REME need only show that these highly compensated employees "customarily and regularly perform[ed] <u>one</u> or more of the duties or responsibilities of an executive, administrative or professional employee" in order for the employee to be "deemed" exempt from the overtime requirements of the FLSA. *See* 29 C.F.R. § 541.601. This defense will not, however, apply to McPherson or the remainder of the MWDs who earned less than $100,000 during the relevant time period, and this fact alone should warrant the Court denying McPherson's bid for conditional certification. *See Rodriguez*, 2013 WL 5372529, at *5 (noting that to meet his burden on conditional certification, the plaintiff must, among other things, establish that the "aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted").

17

Moreover, the job responsibilities of many MWDs are drastically different than the cursory and conclusory descriptions of the job duties McPherson, Murphy, and Blake allege they performed in their identical declarations.  This point is relevant at this stage, not to establish that an exemption applies, but rather to prove that McPherson is not similarly situated to the individuals he seeks to represent and that different defenses will therefore apply to these employees.

Importantly, in his form declaration McPherson maintains, that "[e]very aspect of his job was predetermined;" that "no one report[ed to [him];" that he did not have the ability to discipline or in "any way supervise anyone on the jobsite;" that his job duties were "carried out in accordance with strict, well-established company policies, practices, and standards;" and that his "work was primarily manual labor and technical in nature."  *See* Doc. No. 36 at Exhibit 1 ¶¶ 5, 7, 10.

This is in stark contrast to the job responsibilities of other MWDs who McPherson seeks to represent.  Unlike McPherson, many MWDs do train and supervise lower-level employees. *See e.g.*, Exhibit D at ¶¶ 4, 6, 9; Exhibit F at ¶ 7 ("One of my primary job duties as a Lead MWD is to train the MWD Trainees and the Night MWDs who are assigned to my crew."); Exhibit G at ¶ 7 ("As a lead MWD, I am responsible for training, supervising and directing the work of either the MWD Trainee or the Night MWD who is assigned to my crew); Exhibit H at ¶ 4 ("As a Lead MWD, I am responsible for checking the accuracy of the work done by the Night MWD, reviewing the Night MWDs capabilities, and ensuring that the Night MWD is trained to handle all issues that may arise"); Exhibit I at ¶ 7 ("I am in charge of training and supervising the junior MWDs who are assigned to the night shift, and this task is critical to making sure that the job runs smoothly 24 hours a day.").

Unlike McPherson, some MWDs are required to exercise discretion in performing their job duties, which vary from job to job depending on the circumstances, and these MWDs rarely, if ever, rely upon "strict well-established company policies" in performing their duties. *See e.g.*, Exhibit F at ¶ 14 ("[w]hile I refer to the MWD manual on occasion to refresh my memory regarding how to perform certain tasks, for the most part, as a Lead MWD I have to know how to troubleshoot problems that arise and do not refer to the manual to do so."); Exhibit G at ¶ 16 ("There are no established procedures for troubleshooting a problem because there are a number of things that can go wrong and the solution depends on the problem at hand."); Exhibit I at ¶ 6 ("As a higher level MWD, I have discretion to find solutions to problems for the mud pulse tool and other equipment used by MWDs" and "[n]o manual addresses all of the issues presented on a job, so it comes down to what I know about the rock formation, the quality of the drilling mud being used by the operator, my knowledge of the other pumps or electronic equipment around the drill site and my understanding of how to interpret surveys to ensure that they are within tolerance."); Exhibit J at ¶ 10 ("I have heard that there is an MWD manual, but I have never used it" and "[a]t the most, the MWD manual covers basic procedures, but it does not tell you how to interact with all the people you need to interact with to do your job . . . .").

Unlike McPherson, not all MWDs' work is "primarily manual labor."  *See* Exhibit G at ¶ 12 ("I would estimate that roughly 2% of my job duties as a Lead MWD consist of any form of 'manual labor'" and "98% of the time I am sitting in a chair."); Exhibit F at ¶ 12 ("The average length of the MWD jobs I have worked is about 30 days" and "[d]uring those 30 days, I would estimate the MWDs perform manual labor about 10% to 20% of the time, but this number varies depending on a number of factors"); Exhibit J at ¶ 11 ("The manual labor in changing out and

building the MWD tool may equal 15-20% of an MWD's job duties, but that estimate sounds high to me.")

Unlike McPherson, some MWDs complete performance reviews and make recommendations regarding promotion decisions that are accorded substantial, if not dispositive weight by the ultimate decision makers. *See e.g.*, Exhibit D at ¶ 11 ("These MWD Field Assessments are strongly taken into consideration and are given a lot of weight when decisions are being made regarding promoting an MWD to the next level."); Exhibit E at ¶ 8 ("I try to complete MWD Field Assessments for the lower-level MWDs that work with me at the completion of every job" and "I have been told by my coordinator that he makes promotion decisions and awards pay raises based on the information in the MWD Field Assessments."); Exhibit F at ¶ 8 ("I complete performance reviews of the lower-level MWD who I am supervising at the conclusion of every job" and "in these assessments I generally assess the lower-level MWDs' performance, ability to do the job, willingness to learn, and work ethic[]."); Exhibit H at ¶ 4 ("My MWD Coordinator asks me my opinion about the performance of the lower-level MWDs who I work with" and "[h]e also asks me for recommendations when determining whether to provide the lower-level MWDs who I supervise a promotion or a raise."); Exhibit G at ¶ 8; Exhibit I at ¶ 7; Exhibit J at ¶ 7.

Unlike McPherson, some MWDs have the authority to discipline employees.  Exhibit E at ¶ 11 ("I have the authority as the Lead MWD to discipline the MWD Trainees and Night MWDs that work under my supervision.").  Exhibit J at ¶ 4 ("As a Senior Lead MWD, I have the authority to kick less senior MWDs off of jobs and have done so six or seven times since 2010."); Exhibit F at ¶ 6.

Given the above-described substantial differences in job responsibilities, McPherson simply cannot establish that he is similarly situated to the large and disparate class of MWDs he seeks to represent in this action. *See Aguirre*, 2006 WL 964554 at *7 (noting that "employees with the same job title are not 'similarly situated' for the purpose of an 'opt-in' FLSA class if their day-to-day job duties vary substantially" and denying conditional certification because job duties assigned to some putative class members "require[d] them to exercise more discretion and independent decision-making on a daily basis than other [putative class members] and because some class members duties "varie[d] from day-to-day and change[d] over time."). Thus, conditional certification should be denied.

## V.
## CONCLUSION

McPherson's Motion should be denied from the outset because he has not set forth any reliable evidence to satisfy his burden of proving that he is similarly situated to the members of the putative class of MWDs that he now presumably seeks to represent. McPherson's Motion should also be denied for the additional reason that the unreliable evidence he did proffer in support of his Motion, if accorded any weight, affirmatively demonstrates that his job duties differed substantially from other members of the putative class of MWDs. As a result, he is not similarly situated to these employees. Thus, conditional certification should be denied.

Dated:  November 21, 2014

Respectfully submitted,

*/s/ Stefanie R. Moll*

Stefanie R. Moll
Attorney-in-Charge
TX Bar No. 24002870
Fed. I.D. No. 22861
smoll@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  713.890.5000
F:  713.890.5001

ATTORNEYS FOR DEFENDANTS
LEAM DRILLING SYSTEMS LLC AND
REME, LLC

Of Counsel:

Ronald E. Manthey
TX Bar No. 12927400
Fed. I.D. No. 18049
ron.manthey@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201
T. 214.466.4000
F. 214.466.4001

T. Cullen Wallace
State Bar No. 24072412
Fed. I.D. No. 1383060
twallace@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  713.890.5000
F:  713.890.5001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of November 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following recipients:

Richard J. (Rex) Burch
BRUCKNER BURCH PLLC
8 Greenway Plaza, Suite 1500
Houston, Texas 77046

Michael A. Josephson
Andrew Dunlap
Lindsey R. Itkin
FIBICH, LEEBRON, COPELAND, BRIGGS
& JOSEPHSON, L.L.P.
1150 Bissonnet
Houston, Texas 77005

David T. Bright
SICO, WHITE, HOELSCHER, HARRIS & BRAUGH, LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401

Attorneys for Plaintiff

*/s/ Stefanie R. Moll*
Stefanie R. Moll

DB1/ 81367684.1