UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENT MCPHERSON, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-02361 |
| | § | |
| LEAM DRILLING SYSTEMS, LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court is Defendants' Motion for Conditional Certification. Doc. 36. Having considered the motion, response, replies, the facts in the record, and the applicable law, the Court concludes the motion should be granted.

## I.    Background

This is a collective action for unpaid overtime based on alleged misclassification of nonexempt employees under the Fair Labor Standards Act of 1938 (FLSA). 29 U.S.C. Ch. 8. Plaintiff Brent McPherson was employed by Defendant LEAM as a "MWD[1] Field Operator." Doc. 36-1 ¶ 1. He seeks to represent a class consisting of "All MWD/LWD Field Operators employed by LEAM DRILLING SYSTEMS, LLC and REME, LLC during the past 3 years." Doc. 62-1 ¶¶ 7, 8. McPherson alleges MWD/LWD Field Operators ("MWDs") employed by Defendants regularly work more than 80 hours in a week but do not receive overtime. Doc. 62-1 ¶¶ 19–25. Defendants admit they did not pay MWDs overtime because the MWDs were properly classified as exempt from the overtime requirements of the FLSA. Doc. 70 ¶ 24. Nonetheless, Defendants have since reclassified the MWDs as entitled to overtime. Doc. 70 at 7.

---

[1] "MWD" stands for "Measuring While Drilling; "LWD" stands for "Logging While Drilling." Doc. 66-1 at 5.

## II.    Legal Standard

Section 216(b) of the FLSA permits an employee to bring an action "for and [on] behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b). Like most district courts, this Court handles FLSA claims in two stages, as set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), a notice stage followed by a decertification stage. *See Blake v. Hewlett-Packard Co.*, No. 4:11-CV-592, 2013 WL 3753965, at *4 (S.D. Tex. July 11, 2013) (explaining rationale). In the notice stage, the court makes a preliminary determination of whether potential plaintiffs are similarly situated to the named plaintiff. *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). Plaintiffs bear the burden of establishing they are similarly situated to other employees in the proposed class. *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 506 (M.D. La. 2005). The FLSA does not provide a definition of "similarly situated," leaving the matter for courts to determine. *See* 7B Fed. Prac. & Proc. Civ. § 1807 (3d ed.). Courts customarily determine whether the burden at the notice stage is met "based only on the pleadings and any affidavits which have been submitted."  *Mooney,* 54 F.3d at 1213-14. Courts apply a "fairly lenient standard," requiring only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Mooney,* 54 F.3d at 1214, n.8 (citing *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). Courts consider various factors according to the specific claims and defenses asserted; in a misclassification case, the two material factors are generally the company's implementation of a common corporate policy and the employees' performance of similar job duties. *Blake v. Hewlett-Packard Co.*, 2013 WL 3753965, at *5 (S.D. Tex. July 11, 2013); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (certification in a misclassification case "must be analyzed in terms of the nature of the job duties

performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt"); *see also H&R Block, Ltd. v. Housden*, 186 F.R.D. 399 (E.D. Tex. 1999) (listing factors including "whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; and whether evidence of a widespread discriminatory plan was submitted") (internal citations omitted); *Maynor v. Dow Chemical Co.*, 2008 WL 2220394, at *6 (S.D. Tex. 2008) (listing factors including: "(1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit."). Courts have denied conditional certification where "the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England,* 370 F. Supp. 2d at 507. In addition, courts often consider policies of judicial economy and avoidance of "'stirring up' of litigation through unwarranted solicitation" as balanced against the remedial policy of the FLSA. *Severtson v. Philips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991); *see Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (explaining that the benefits of collective actions for judicial economy depend on employees receiving "accurate and timely notice" and that "the potential for misuse of the class device, as by misleading communications, may be countered by court-authorized notice").

If the court finds potential plaintiffs similarly situated, the court conditionally certifies the action and authorizes notice to potential plaintiffs to opt in, and the suit "proceeds as a representative action throughout discovery." *Mooney,* 54 F.3d at 1214. After the close of discovery, the defendant initiates the second stage by filing a motion for decertification. *Id.* At this stage, the court makes a factual determination from discovery evidence of whether the

plaintiffs are "similarly situated." *Id.*; *see Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) ("The 'similarly situated' standard at the second stage is less 'lenient' than at the first . . . . Exactly how much less lenient we need not specify, though logically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action."). If the court determines from discovery evidence that the plaintiffs are in fact similarly situated, the case proceeds as a representative action. *Mooney*, 54 F.3d at 1212. If the court finds that the plaintiffs are not similarly situated, then the class is decertified, the "opt-in" plaintiffs are dismissed without prejudice, and the original plaintiffs proceed to trial on their individual claims. *Id.* at 1213–14. Where discovery has occurred prior to the motion for conditional certification, the court may apply an intermediate approach, "imposing a heightened evidentiary standard commensurate with the opportunity to conduct discovery." *Blake v. Hewlett-Packard Co.*, 4:11-CV-592, 2013 WL 3753965, at *5 (S.D. Tex. July 11, 2013). After the court has denied a motion to decertify, the court may revisit the issue as the case progresses. *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 572 (E.D. La. 2008) (decertifying after trial); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (holding decertification orders in class actions are not appealable and are amendable by the district court under Rule 23); *Baldridge v. SBC Communications, Inc.*, 404 F.3d 930, 931 (5th Cir. 2005) (applying *Coopers* to FLSA); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.").

## III.   Discussion

### A.   Existence of Class Members

A preliminary issue in determining whether the putative class members are similarly situated is whether McPherson has made substantial allegations of the existence of potential class members. McPherson has filed three declarations from putative class members and twelve notices of consent to date. In addition, each declaration states: "I know based on my conversations with other Drillers and Operators that, if given the opportunity, these individuals would participate in a lawsuit to recover unpaid overtime compensation." McPherson Decl., Doc. 36-1 at ¶ 12; Murphy Decl., 36-2 at ¶ 12; Blake Decl., 36-3 at ¶ 12. McPherson further alleges: "Plaintiffs and their counsel have received numerous inquiries from other individuals currently employed by Defendants who are interested in joining the case, but are afraid of retaliation for doing so." Doc. 36 at 19 n.4. Defendants argue the declarations should be accorded no weight, because they are "identical, boilerplate, and conclusory" and "contain material misstatements." Doc. 66 at 4. In particular, Defendants cite Patrick Blake's statement in his declaration that he was employed as a "directional driller." Doc 36-3 at 2. In the initial conference, Plaintiff's counsel stated: "We do have a directional driller in the case. His name is Mr. Blake. To say that we don't have a representative group is just materially false." Doc. 66-1 at 16. Blake later admitted in a deposition that he was not a Directional Driller but was an MWD:

> Q.  It says, I was employed as a directional driller by LEAM. That's not correct, is it?
> A. It's actually a typo. It should be, I was employed in directional drilling.
> ……..
> Q. Why did you sign it without it being corrected?
> A. It was just a typo.

Doc. 66-1 at 7. The complaint was subsequently amended to omit Directional Drillers. Doc. 65. Since the amended putative class includes only MWDs, the fact that Blake was an MWD does not weigh against conditional certification of the class, nor does it raise credibility issues as to the other declarations and notices of consent.

### B.    Common Discriminatory Policy

Given the existence of potential class members, the Court must determine whether McPherson has made substantial allegations that the potential class members were subject to a "single decision, policy, or plan infected by discrimination," *Mooney,* 54 F.3d at 1214, n.8, rather than "circumstances purely personal to the plaintiff." *England,* 370 F.Supp.2d at 507. McPherson has alleged MWDs were uniformly misclassified as exempt. *See* McPherson Decl., Docs. 36-1 at ¶ 11 ("We were all also subjected to the same or similar pay practices."); 36-2 at ¶ 11 (same); 36-3 at ¶ 11 (same); Oral Dep. of LEAM's Vice President of Finance, Doc. 36-9 at 17–21 (explaining that MWDs were subject to a uniform corporate payroll policy that did not include overtime). He also alleges Defendants have reclassified putative class members and started paying them overtime without compensating them for unpaid overtime. Doc. 75 at 2. There is no genuine issue as to whether the case arises from a single payroll policy affecting MWDs that readily lends itself to class treatment (as the term "misclassification" suggests). *Cf. Griffith v. Wells Fargo Bank, N.A.*, 4:11-CV-1440, 2012 WL 3985093, at *5 (S.D. Tex. Sept. 12, 2012) (denying conditional certification where single plaintiff alleged he felt "pressure" to perform uncompensated overtime work but failed to show there was a nationwide overtime policy); *Shanks v. Carrizo Oil & Gas, Inc.*, 4:12-CV-3355, 2013 WL 6564636, at *1 (S.D. Tex. Dec. 11, 2013) (denying conditional certification where oilfield worker in one oil field failed to submit evidence of a widespread overtime policy and where Vice President of Human Resources stated different policies applied to workers in different shale plays).

### C.    Common Defense: the Executive Exemption

Finally, the Court must consider whether putative class members are similarly situated with respect to potential defenses. Here, the relevant defense is the executive exemption under

Section 13(a)(1) of the FLSA. 29 U.S.C. § 213(a)(1). Defendants argue some MWDs performed managerial and supervisory duties satisfying the executive exemption, while other MWDs did not meet these requirements.[2]

The executive exemption applies to "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). Department of Labor regulations define "employee employed in a bona fide executive capacity" as any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week [$23,660 per year] . . .
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). "Primary duty" is determined by considering all the facts in the case, such as the relative importance and amount of time spent performing executive versus nonexempt duties, freedom from direct supervision in performing executive duties, and pay compared to nonexempt employees. 29 C.F.R. § 541.700. As an example, while employees who spend the majority of their time performing executive duties generally will satisfy the primary duty requirement, assistant managers who spend less than 50% of their time performing exempt duties and who are "closely supervised and earn little more than the nonexempt employees" will not. 29 C.F.R. § 541.700. A separate "highly compensated employee" exemption provides: "An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive . . . employee." 29 C.F.R. § 541.601. Thus, the

---

[2] Defendants appear to concede that some MWDs, including McPherson, were misclassified as exempt. Doc. 66 at 1.

executive exemption applies if an employee earns over $100,000 (including $23,600 on a salary basis) and meets *any* of the executive duties listed in § 541.00(a), e.g., "customarily and regularly direct[ing] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). Finally, a separate subsection provides the executive exemption does not apply to '"blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy" and who are trained "through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists." 29 C.F.R. § 541.3(a).

### D.    Highly Compensated Employee Exemption

Some MWDs testified they may have earned more than $100,000 per year. Doc. 66-1 at 42 ("I am on pace to earn over $100,000 in 2014."); Doc. 66-1 at 47 ("I earned roughly $103,000 in 2013, and I am currently on pace to again earn over $100,000 in 2014."); Doc. 66-1 at 52 ("I did not earn over $100,000.00 in either 2012 or 2013 . . . . If my current pay as a Lead MWD keeps up, I think I will earn over a $100,000 a year in 2014."); Doc. 66-1 at 58 ("I  have earned the equivalent of over One Hundred Thousand Dollars ($100,000.00) a year since becoming an Break-Out Lead MWD."); Doc. 66-1 at 61 ("I earned $121,000 in 2013 and I am on pace to earn roughly $175,000 this year."); Doc. 66-1 at 64 ("In every year since [2011] I have earned over $100,000 . . . ."). The putative class appears to fall on the border of "highly compensated employees." Certifying such a class could result in a fragmented trial involving two different defenses: (1) plaintiffs were exempt because they performed all of executive duties listed in § 541.100(a), and (2) plaintiffs earning over $100,000 were exempt because they performed *any* of the listed duties.

E.      **Standard Executive Exemption**

Whether or not the highly compensated employee exemption applies, the putative class would be misclassified if none of the MWDs performed any of the executive duties listed in 29 C.F.R. § 541.100. Thus, the Court must address whether McPherson has substantially alleged that no MWDs performed any of the listed duties.

*1.*      **Primary Duty as Manager**

McPherson alleges the primary duty of all MWDs was nonexempt work, rather than "management of the enterprise or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a). The parties disagree as to the primary duties of MWDs. An online job posting states:

> LEAM is looking for inexperienced and experienced MWD field Operators to work on oil and gas wells. As an MWD Operator you will check data quality and interpret MWD / LWD surveys, formation responses, and drilling mechanics. The MWD / LWD Field operator will also perform engineering programs according to the client's request. Advanced PC skills, strong mechanical skills, the ability to travel for extended periods of time & work on a 24-7 "on-call" schedule are required.

http://www.leam.net/leam-careers/job-openings, Doc. 36-8.

LEAM's Vice President of Finance testified: "Generally, [MWDs] take surveys." Doc. 36-9 at 9.  In his deposition McPherson testified as follows:

> Q. What's your primary responsibility on the job?
> A. It's a lot of technical, and it's a lot of manual labor as far as your primary responsibilities. Your responsibilities are to set up the computers, to print out your reports, to use the computers to program the tool. You have to build the tool. You have to load and unload the truck. You have to put the tool in the hole. You have to pull the tool out of the hole. You have to put the transducer on the stand pipe. You have to configure your poppet orifice. You're responsible for—that pretty much covers it, as far as all your computer work and a lot of your labor. . . .
>
> Q. Talk to me about your job duties that relate to reading the surveys. . . .
> A. There's a lot of—there's 50 different steps we can go through. You're doing the same thing over and over. It's very repetitive. When a survey comes up, you

take the information that comes up off of your computers, and you combine all that information, be it graphs, be it numbers, be it depths. You combine all that stuff and you put it in your distribution list and you send it off to the people that requested it. And that's your coordinator; that's your company man; that's your drilling superintendent, anybody that's on the distribution list that's provided by your operator.

Q. Sometimes are the readings off?

A. Sometimes, yes, ma'am.

Q. And what do you do when that occurs?

A. Usually there's about four things you can do; and before you do them—if it happens once, you just recycle the pumps; but if it happens again, you're going to have to call your coordinator and see what they want to do. It's their call as far as how you're going to troubleshoot it.

Q. Other than recycling the pumps, you're not authorized to do anything, other than call your coordinator?

A. Not without really—not without clearing it with the company man and not without calling your coordinator.

Doc. 71-4 at 6, 9–10.

Another MWD testified as follows:

Q. What does one do in the technical part of the job?

A. Record data and the quality of that data. . . .

A. The MWD field hands would use pre-programmed--pre-programs to program the tool from the office. The office would approve what we would install on the tool in a particular area?

Q. Okay. And what if the tool did not accept it, like my computer often does not accept my commands?

A. We would coordinate with our MWD coordinators and ask them what they want us to do. . . .

Q. You said there was also a physical component to the job as MWD. What was that?

A. Building the tool. . . . Assembling the MWD tool and running cables and setting up the computers for monitoring.

Q. Okay. When is that done?

A. At the beginning of the job.

Q. Okay. . . . I take it it varies, but let's assume you were on the job site for four weeks?[3] . . . What would you do with regard to running the cables and setting up the tool between the setup and takedown?

A. Once the cables were set up and a connection was established, then they would stay in place.

---

[3] Defendants have submitted a declaration stating the average length of MWD jobs is "about 30 days." Doc. 66-1 at 49. McPherson testified the average job length was "9 to 15 days." Doc. 71-4 at 6.

Blake Dep., Doc. 71-3 at 3–8.

Finally, McPherson's declarations state:

Every aspect of my job was predetermined for me by Defendants, including the tools I used, data compiled, and schedule worked. . . . My work was primarily manual labor and technical in nature. It required little to no official training nor an advanced degree. Likewise, no one reports to me and I do not have the ability to hire, fire, discipline, or in any way supervise anyone on the jobsite.

Docs. 36-1 at ¶¶ 5–7; 36-2 at ¶¶ 5–7; 36-3 at ¶¶ 5–7. The foregoing testimony, job posting, and declarations suggest MWDs are essentially technicians without management responsibility.

Although Defendants challenge the credibility of Plaintiff's "boilerplate" declarations, they do not dispute the truth of the allegations as applied to the three declarants. Rather, Defendants argue declarations from lower-level MWDs do not apply to MWDs in general. Defendants offer a statement from an MWD Coordinator that there are five levels of MWDs: "(1) the MWD Trainee, also known as an MWD I; (2) the Night MWD, also known as an MWD II; (3) the Break-Out Lead MWD, also known as an MWD III; (4) the Lead MWD, also known as the MWD IV; and (5) the Senior Lead MWD, also known as the MWD V." Doc. 66-1 at 36. According to the declaration from the MWD Coordinator, MWD Is and IIs have no supervisory authority; MWD IIIs sometimes supervise lower-level MWDs and "lead jobs about 15% to 20% of the time"; MWD IV and Vs train, supervise, and complete Field Assessments of lower-level MWDs, and sign Railroad Commission Reports certifying the accuracy of surveys; and only MWD Vs may lead jobs "where there is no cell phone service and the MWD Coordinator cannot be reached for questions." Doc. 66-1 at 36–39. An MWD V "is almost like an MWD Coordinator and has the authority to make important decisions on the fly that bind REME." Doc. 66-1 at 39.

Defendants have submitted six "happy camper" declarations from MWD IV and Vs who claim to have supervisory authority over lower-level MWDs. The declarations, however, reveal that

MWD IV and Vs have limited authority as far as "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(1). As the following declarations suggest, MWD IV and Vs ("Lead" and "Senior Lead" MWDs) only appear to "manage" and train new employees in the limited context of working together with another MWD to install and operate a well measurement tool.

> As the Lead MWD, I am responsible for coordinating the job from start to finish. Accordingly, I instruct and direct the lower-level MWDs on how and where to set up the equipment while I program the computers and the MWD tool. . . . I am able to use my discretion to properly calibrate the mud pulse tool . . . .

Doc. 66-1 at 43 ¶¶ 4, 6.

> One of my primary job duties as a Lead MWD is to train the [MWD I and IIs] who are assigned to my crew. I instruct and direct these lower-level MWDs on how to set up all of the equipment on a job and how to log the well that is being drilled by the [Directional Driller].

Doc. 66-1 at 48 ¶ 7.

> When I was promoted and started working the day shift s a Break-out Lead, I became responsible for the MWD job at the drilling location. By that, I mean I was fully responsible for the accuracy of the readings of the sensor equipment, the rigging of the sensor equipment, operation of the equipment, and monitoring and training the lower-level MWD on my crew, which was usually an [MWD I or II]. . . . Doc. 66-1 at 57 ¶ 3.   If I encounter a problem with my MWD tool during the drilling process, I do not believe that I have the authority, on my own, to direct the Directional Driller ("DD") or the operator to stop drilling and pull the MWD tool out of the well. Instead, I usually contact my MWD Coordinator and receive guidance about whether it makes sense to pull the tool out of the hole and delay the drilling process.

Doc. 66-1 at 54 ¶ 3.

> I never trained anyone though until I was a Level 4 MWD. In my opinion, a break out MWD (Level 3) is not ready to train others. I won't say that MWD Levels 1-3 never train, but they don't do so on a regular basis. I did not have these supervisory responsibilities prior to becoming [an MWD IV].

Doc. 66-1 at 52 ¶ 17.

McPherson, on the other hand, testified there were no differences in the duties of different levels of MWD.

> Q. Do you know what an MWD level 5 does?
> A. No, ma'am.
> Q. What about a senior MWD? Do you know what that person does, in terms of job duties?
> A. Probably about the same as everybody. You know, [the same as] all the different levels that you're trying to describe to me. . . . . All the different talk about different levels, everybody does the exact same job out there. It's the exact same thing, no matter if you're working days [MWD I], nights [MWD II], break-out lead [MWD III], lead [MWD IV], whatever you want to whatever you want to title anybody out there as, as far as under an MWD, it's the exact same job. It doesn't matter if you're going to say you're a senior [MWD V], if you're a break-out [MWD III]. Anything of that sort, you're doing the same job . . . . Based on . . . somebody being classified as a senior lead [MWD V], I would assume that they have more time in the field as I do; but since I've worked with those people, I know that we have the same duties.

Doc. 71-4 at 3–4.

Another MWD testified, "I did not know there was five levels of MWD," but admitted there were "trainee" and "lead" MWDs. Blake Dep., Doc. 71-3 at 6. McPherson's declarations state:

> Based on my experience as an employee of Defendants and conversations with other Drillers and Operators employed by Defendants, I know we all perform the same general duties and work towards the common goal of drilling directional wells. . . . While our job titles and exact duties may differ, our jobs were carried out in accordance with strict, well-established company policies, practices, and standards.

Docs. 36-1 at ¶ 8, 10; 36-2 at ¶ 8, 10; 36-3 at ¶ 8, 10.

Testimony from LEAM's Vice President of Finance suggests MWDs received uniform training and used the same equipment and software. Doc. 36-9 at 9–13. She gave less specific testimony as to whether MWDs were under the general supervision of MWD Coordinators:

> Q. Do they obtain instruction from either LEAM or REME as to how to perform their job duties?
> A. It is my understanding that the coordinators communicate with the REME MWD employees, but I do not know what that communication entails.

Doc. 36-9 at 10.

In sum, the evidence suggests Defendants typically assign each job to one experienced and one less experienced MWD who jointly operate an MWD tool under the supervision of an MWD Coordinator, during which the senior MWD trains the junior MWD. Defendants have failed to counter McPherson's substantial allegations that the MWDs themselves were not primarily managers, in terms of relative time spent, importance, freedom from direct supervision, and salary compared to lower-level MWDs doing the same MWD job. 29 C.F.R. § 541.700; *cf., Mims v. Starbucks Corp.,* Civil Action No. H-05-0791, 2007 WL 10369, at *4–5 (S.D. Tex. Jan. 2, 2007) (Starbucks "store managers" are primarily managers and not simply "glorified baristas").

*2.*     **Supervisory Duties**

Defendants fail to argue MWDs "customarily and regularly direct[] the work of *two or more* other employees." 29 C.F.R. § 541.100(a) (emphasis added). McPherson alleges: "[MWDs] work together in two man teams performing skilled technical services, usually at the well site." Doc. 62-1 at ¶ 19. Defendants concede: "MWDs generally work in two man crews that consist of either an MWD Trainee or Night MWD, who is more junior, and a Lead or Senior Lead MWD, who is more senior and is responsible for leading the job." Doc. 66 at 6. Logically, if MWDs only work in two man teams, MWDs cannot each direct the work of two or more MWDs. Citing a declaration from an MWD IV, Defendants add: "This is not always the case, however, as there are jobs on which a Lead MWD will supervise and oversee the work of two junior MWDs." Doc. 66 at 6. The declaration states:

> I recently worked as a Lead MWD on a job where I was responsible for supervising and overseeing the work of an MWD Trainee and a Night MWD on the same job. The MWD Trainee spent nine hours of his shift working under my supervision during the day and three hours working on the night shift with the Night MWD.

Doc. 66-1 at 42-43. This statement does not suggest the declarant, much less the putative class, "regularly and customarily" directs the work of two other MWDs; rather, it states one Lead MWD supervised a Trainee MWD who continued working under the supervision of a Night MWD after the Lead MWD's shift ended.

   *3.*   **Authority to Hire and Fire**

The parties disagree as to whether MWDs had "authority to hire or fire other employees" or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a). The rule provides several possible factors for determining "particular weight": "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Suggestions and recommendations may have particular weight "even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*; *see Lovelady v. Allsup's Convenience Stores, Inc.*, 304 Fed. Appx. 301, 306 (5th Cir. 2008) (finding particular weight where store managers' hiring recommendations were "almost always" followed and they had fired employees without seeking authorization). Courts have found particular weight where employees were required to submit standardized evaluations which were presumably relied upon. *Rainey v. McWane Inc.*, 314 Fed. Appx. 693, 696 (5th Cir. 2009) (particular weight existed where production supervisors "exclusively" evaluated other employees on a weekly basis and failed to show their recommendations were not typically followed); *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082-83 (E.D. Tex. 2011)

(totality of evidence showed particular weight where assistant managers conducted regular performance reviews, "some" recommendations regarding hiring were followed, and the cumulation of written and verbal warnings could result in termination); *but see Villegas v. Dependable Const. Services, Inc.*, CIV. 4:07-CV-2165, 2008 WL 5137321, at *19-20 (S.D. Tex. Dec. 8, 2008) (finding no particular weight based on one recommendation in four years to transfer an employee and stars drawn in the corners of job applicants' resumes to suggest approval for hiring); *Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 558 (3d Cir. 2006) (no particular weight based on ten hiring and two termination recommendations by five crew leaders over thirty-plus years of combined service); *Bullard v. Babcock & Wilcox Technical Services Pantex, L.L.C.*, CIV.A. 2:07-CV-049-J, 2009 WL 1704251, at *14-15 (N.D. Tex. June 17, 2009), *vacated on other grounds sub nom. Stokes v. BWXT Pantex, L.L.C.*, 424 Fed. Appx. 324 (5th Cir. 2011) (Field Lieutenants' recommendations had particular weight, but Desk and Administrative lieutenants' did not; "These positions either follow a different practice or do not have the long-term personal supervision which causes management to give particular weight to their opinions regarding an individual applicant for promotion."); *Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 905 (8th Cir. 2014) (informal recommendations did not have particular weight where defendant "did not present any evidence that the plaintiffs were involved in, for instance, screening applicants, conducting interviews, checking references, or anything else related to its hiring process").

Here, MWD IVs submit regular Field Assessments to MWD Coordinators and may recommend removal or reassign lower-level MWDs to different tasks.

> If either the MWD Trainee or the Night MWD is not pulling his weight on the job or is otherwise causing problems, I will assign them less desirable tasks as a means of disciplining them. That being said, I do not believe that I have the authority to unilaterally have a lower-level MWD removed from the job.

Doc. 66-1 at 44; *see also* Doc. 66-1 at 48 ("As a lead MWD, I have recommended to my MWD Coordinator on several occasions that a lower-level MWD who I was supervising be removed from the job. . . . I do not have the authority to remove a lower level MWD from the job without my coordinator's approval."); Doc. 66-1 at 58 ("My recommendations are taken seriously. For example, I have recommended and had a Night MWD removed from the job as he was just not following my directions."); Doc. 66-1 at 53 ("I have never run another MWD off the job and have never had to call my Coordinator to tell him that a particular MWD has got to go, but if I felt the need I would not hesitate to do so."). One declaration from an MWD V suggests MWD Vs may have slightly more influence on removals than MWD IVs:

> As a Senior Lead MWD, I have the authority to kick less senior MWDs off of jobs and have done so six or seven times since 2010. I have kicked MWDs off of jobs for various reasons including lack of interest in our job duties and not being able to wake up to perform job duties. Though I do call my coordinator when this occurs, I am not really calling to ask permission. Rather, I am calling my coordinator to tell him what occurred and my experience with the company allows me to proceed in this manner.

Doc. 66-1 at 64. In regard to hiring, although MWD IVs do not have authority to hire other MWDs, MWD Coordinators rely on Field Assessments in making employment decisions. Doc. 66-1 at 48 ("I believe that the MWD Coordinators rely on the assessments performed by the Lead and Senior Lead MWDs to determine whether a lower-level MWD is qualified to be promoted to the next level"); Doc. 66-1 at 53 ("Without my evaluation, I do not believe that the MWD Coordinator would have any basis to evaluate a junior MWD's performance and make promotion decisions.").

> I have been told by my coordinator that he makes promotion decisions and awards pay raises based on the information in the MWD Field Assessments. In fact, I have had an MWD Coordinator contact me and ask me to complete all MWD Field Assessments for an MWD who I had supervised so that the coordinator could determine whether to promote this particular individual.

Doc. 66-1 at 44.

Again, based on one declaration, MWD Vs may have slightly more influence over the promotion of lower-level MWDs with whom they had worked, although they appear to follow the same procedure as MWD IVs in submitting Field Assessments.

> As a Senior Lead MWD, I make promotion recommendations all the time and my word on this matter is given lots of weight. . . . I believe that my recommendation and the field assessment that I complete on the lower level MWDs are given a lot of weight because the only thing the office sees on one of our typical jobs is the tools we send back and our paperwork. . . . I believe that if an MWD gets a number of bad field assessments he can be fired as a result.

Doc. 66-1 at 65.

MWD IV and Vs may also request certain lower-level MWDs be assigned to work with them. Doc. 66-1 at 53 ("I have made requests to my MWD Coordinator about which lower level MWDs I would like to have on my crew. The MWD Coordinator listened to my requests, and I believe that the Coordinator will generally do so when possible."); Doc. 66-1 at 44 ("I communicate regularly with my MWD Coordinator and request that certain MWDs be assigned to my crew. I also request that certain MWDs not be assigned to my crew. My MWD Coordinator has always granted my requests."); Doc. 66-1 at 58 ("I can request that certain people get assigned to work on my crew. I make this request to my MWD Coordinator, and he tries to honor my requests when they are made."). Based on one declaration, MWD Vs may have limited authority to determine the schedule of lower-level MWDs.

> As the Lead MWD I can make the decision on the hours that the MWDs work though we usually work a 6:00 to 6:00 tower. If I didn't want to get up early I could say we're doing 8:00 to 8:00 today. This is my call and not the lower level MWD's call.

Doc. 66-1 at 54; *but see* Doc. 66-1 at 49 ("We usually work a 12-hour shift in the field, with the more senior MWD working the day shift from 6 a.m. to 6 p.m. . . . I do not believe that I could

change the hours we work without getting it cleared by my coordinator."). Overall, the evidence suggests some MWD IVs and Vs, but not MWD Is and IIs, make employment recommendations through Field Assessments and informal reports that are given particular weight.

     *4.*     **"Blue Collar" Exclusion**

     "Manual laborers or other 'blue collar' workers" without advanced degrees who perform "repetitive operations with their hands, physical skill and energy" are excluded from the executive exemption. 29 C.F.R. § 541.3(a). "Blue collar" is not defined, but examples of blue-collar professions are provided:

> [N]on-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers have always been, and will continue to be, entitled to overtime pay.

29 C.F.R. § 541.3(a). Presumably the exclusion does not apply to office workers, including those who lack advanced degrees and perform repetitive operations with their hands. Some office workers may be nonexempt, while others may fall under the "white collar" executive, administrative, and other exemptions. The administrative exemption conflates "office" and "non-manual" work. 29 C.F.R. § 541.200 (administrative employees perform "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"). Courts thus tend to restrict the blue collar exclusion to traditional "manual labor" outside of an office setting, with varying interpretations of the word "manual." *See McCoy v. N. Slope Borough*, 3:13-CV-00064-SLG, 2013 WL 4510780, at *10 (D. Alaska Aug. 26, 2013) ("[F]lying an airplane is not manual labor. While the use of one's hands is required, it is the non-manual decision-making that is the key to the successful operation of an airplane. . . . [It] is not performing work similar to the "blue-collar" occupations identified as manual work in the regulation, but rather is performing non-manual work of a highly technical

nature that requires extensive and specialized training."); *compare Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004) ([Shipping specialist's] "'inspection' tasks—even if not performed at his desk—are nonetheless not manual tasks. [He] performs manual tasks when he actually picks up a hammer to brace a load or installs or tightens a strap [but] does not spend so much of his time on these manual tasks so as to fall outside exempt status."), *with Zubair v. EnTech Eng'g P.C.*, 808 F. Supp. 2d 592, 595 (S.D.N.Y. 2011) (highway chief inspector's work at various project sites was not "office or non-manual" work as a matter of law).

Here, the evidence suggests MWDs lack advanced degrees or training, like blue collar workers, but they do not perform traditional blue collar work or "manual labor." In regard to advanced degrees, MWDs are primarily trained on the job, not through a "prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists." 29 C.F.R. § 541.3(a); Doc. 36-1 at ¶ 7 ("My work . . . required little to no official training nor an advanced degree."); Doc. 66-1 at 65 ("I have heard that there is an MWD manual, but I have never used it."). MWD work is not one of the traditional blue-collar professions listed in the rule. 29 C.F.R. § 541.3(a). As for manual labor, Defendants have submitted declarations from MWD IVs estimating manual labor occupied only a small fraction of their time. Doc. 66-1 at 49 ("I would estimate MWDs perform manual labor about 10% to 20% of the time."); Doc. 66-1 at 54 ("I would estimate that roughly 2% of my job duties as a Lead MWD consist of any form of 'manual labor.' 98% of the time I am sitting in a chair."); Doc. 66-1 at 65 ("Tools may have to be changed once a week or more often. The manual labor in changing out and building the MWD tool may equal 15-20% of an MWD's job duties, but that estimate sounds high to me."). Operating the MWD tool is not traditional manual

labor but is performed automatically from a makeshift office. Doc. 71-4. The limited manual labor performed during installation and removal of the MWD tool does not appear to be enough by itself to satisfy the blue collar exclusion. *See Goulas v. LaGreca*, CIV.A. 12-898, 2013 WL 2477030, at *9 (E.D. La. June 7, 2013), *aff'd sub nom. Goulas v. LaGreca Services, Inc.*, 557 Fed. Appx. 337 (5th Cir. 2014) (superintendent of horizontal drilling crew was exempt executive "despite the inclusion of manual labor in his regular duties"); *Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678, 695 (S.D. Tex. 2012), *aff'd,* 755 F.3d 279 (5th Cir. 2014) (coil tubing supervisor was exempt executive even though he "also performed manual labor alongside the [technicians] he supervised while in the field"). Nonetheless, even if MWDs do not perform blue collar or manual labor under 29 C.F.R. § 541.3(a), they are not necessarily exempt under any of the "white collar" exemptions for executive, administrative, professional, computer and outside sales employees. 29 C.F.R. Part 541. As explained above, Defendants fail to counter McPherson's substantial allegations that the primary duties of MWDs were not executive. 29 C.F.R. § 541.700.

## IV.    Similar Cases

Other courts have granted conditional certification of MWDs and other oilfield service workers falling on the border of the executive exemption, without respect to levels. None have examined the effect of the overlapping highly compensated employee exemption on "similarly situated" analysis. *See Blake v. Archer Directional Drilling Services, LLC, et al.*, No. 4:14-cv-02108, (S.D. Tex. Oct 9, 2014) (granting conditional certification of "all Directional Drillers and MWD Specialists Employees"); *West, et al, v. Precision Directional Services, Inc., et al*, No. 2:14-cv-00081 (S.D. Tex. Aug 26, 2014) (granting conditional certification of "all Directional Drillers and MWD Specialists Employees" ); *Syed v. M-L, LLC*, No. 1:12-cv-1718 AWI MJS,

2014 WL 6685966, at *1 (E.D. Cal. Nov. 26, 2014) (granting conditional certification of all mud engineers "or equivalent titles," including "Drilling Fluid Specialists I–IV" who had "progressively less supervision" and more responsibility to train lower level Drilling Fluid Specialists, on grounds that they all generally performed the same task of "tak[ing] measurements of the mud" and all fell "on one side of the line (either all exempt or all not exempt)" for class certification purposes); *Davida v. Newpark Drilling Fluids, LLC*, No. 5:14-cv-00552-HJB (W.D. Tex. Jan 6, 2015) (granting conditional certification of all mud engineers, who the court found were similarly situated with respect to their primary job duties "to monitor, test, and provide recommendations regarding drilling fluids at the drill site"); *Wilson v. Atlas Oilfield Const. Co., LLC*, No. 5:14-cv-304-XR, 2014 WL 4546954 (W.D. Tex. Sept. 12, 2014) (limiting conditional certification of all "Day Rate Workers" to all "solids control operators (and all Persons with the exact same job duties as solids control technicians under different titles)," after holding hearing on motion to certify); *Mateos v. Select Energy Servs., LLC*, 977 F. Supp. 2d 640, 642 (W.D. Tex. 2013) (granting conditional certification of all Safety Coordinators at oilfield water management company; although plaintiff also performed training-related tasks, the "overarching themes" of all Safety Coordinators' work was "performing safety observations and investigating accidents"); *Kelley v. Cal Dive Intern., Inc.*, CIV.A. G-13-001, 2013 WL 2190050, at *1 (S.D. Tex. May 20, 2013) (granting conditional certification of all "offshore employees," who plaintiff alleged "regardless of their job classification, are subjected to the same three illegal aspects of Cal Dive's overtime policy…[I]f discovery establishes [class members] are, in fact, not similarly situated the class can be narrowed or, if appropriate, decertified.").

One court granted conditional certification of "Operators Is," excluding "Operator IIs" and "Operator IIIs" without explanation. *Jeremiah Bills, et al, v. Superior Energy Services, LLC*,

No. 4:12-cv-03647, (S.D. Tex. Sept 9, 2013) (granting conditional certification of all Operator Is

at a pumping and cementing oilfield services company); *see also Yaklin v. W-H Energy Services,*

*Inc.*, No. 2:07-cv-422, 2008 WL 1989795, at *3 (S.D. Tex. May 2, 2008) (granting conditional

class of all "Service Tech I or Service Tech II" employees at a certain location, where plaintiff

had requested certification of all "service technicians, coil tube operators, nitrogen pump

operators, and parts room employees"); *Tolentino v. C & J Spec-Rent Services Inc.*, 716 F. Supp.

2d 642, 652 (S.D. Tex. 2010) (granting conditional certification of all Operators at coil-tubing

oilfield services company, omitting Supervisors); *Thomas v. HCC-High Capacity Coil, LLC*, No.

2:14-cv-17, 2014 WL 4063981, at *1 (S.D. Tex. July 29, 2014), *report and recommendation*

*adopted*, 2:14-CV-00017, 2014 WL 4072136 (S.D. Tex. Aug. 15, 2014) (granting conditional

certification of all "non-managerial field personnel" at coil tubing company, where plaintiff had

requested certification of all non-exempt employees); *Thompson v. Peak Energy Servs. USA,*

*Inc.*, No. 2:13-cv-00266, 2013 WL 5511319, at *1 (W.D. Pa. Oct. 4, 2013) (granting conditional

certification of "all solids control technicians," where plaintiff had requested certification of all

"Day Rate Employees . . . including but not limited to Solids Control Technicians, Rental

Coordinators, Service Quality Coordinators, Training Coordinators, and those in similarly titled

positions); *Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. 4:08-cv-01212, 2008 WL

5204149, *1 (S.D. Tex. Dec. 11, 2008) (granting conditional class of all employees in "non-

managerial positions in the Network Services Group on the Enterprise Server Team," the latter

being one of three teams in one of four groups in the IT Department, where plaintiff had

requested certification of "all IT support specialists").

Another court has granted conditional certification of a class of MWDs divided in three

"subclasses," without explaining the function of subclasses with respect to notice and subsequent

proceedings. Minute Entry, Doc. 25, *Meyer v. Phoenix Technology Services USA Inc.*, No. 4:14-cv-01490 (S.D. Tex. January 26, 2014) (granting conditional certification of "all MWD operators . . . divided into three subclasses: Lead MWDs, Night MWDs, and MWD Trainees"); *but see Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1056 (D. Minn. 2011) (concluding three types of consultants had varying levels of supervision; "[T]he descriptions are so vague that they are not helpful to the FLSA analysis. . . . Even if Plaintiffs were separated into three FLSA subclasses (SCs, BCs, and TCs) certification would be inappropriate.").

None of the cases cited above from this circuit have proceeded to the second stage. It should be noted that Plaintiffs' counsel has also filed dozens of similar cases against oilfield service companies in this district, including at least fifteen cases in the Houston Division involving putative classes of MWDs, none of which has reached second-stage decertification. *But see Metcalfe v. Revention, Inc.*, 4:10-CV-3515, 2012 WL 3930319, at *2 (S.D. Tex. Sept. 10, 2012) (Harmon, J.) (denying motion to decertify class of "technical support staff and/or installers" who were admittedly nonexempt and whose individualized defenses were limited to the issue of damages). Courts in the Corpus Christi and Galveston Divisions have conditionally certified numerous classes of oilfield service workers and vessel tankermen represented by Plaintiffs' counsel, the only exception being where the class was split between multiple companies. *See Ratley v. Harley Marine Services, Inc. et al*, No. 3:12-cv-00247, 2013 WL 530679, at *1 (S.D. Tex. Feb. 12, 2013) ("This is the sixth FLSA 'overtime' case on this Court's docket filed by Plaintiff's counsel on behalf of vessel tankermen employed on barges operating in this area of the country; however, in this case, counsel's proposed class is far too ambitious," including vesselmen "living and working along the entire west coast of the United States.").

**V.      Conclusion**

McPherson has substantially alleged some MWDs were similarly situated with respect to the executive exemption. Some of the MWDs, however, may have been highly compensated employees, who are exempt if they satisfy "any one or more of the exempt duties or responsibilities" of executives under 29 C.F.R. § 541.601. Defendants have shown some MWDs satisfied one of the exempt duties by making employment recommendations that were given particular weight. 29 C.F.R. § 541.100(a). As for other exempt duties listed in § 541.100(a), the evidence suggests MWDs were not primarily managers and did not regularly supervise two or more employees. Therefore, McPherson has at least substantially alleged MWDs who were not highly compensated were similarly situated. It is not clear whether some MWD Is and IIs were highly compensated yet similarly situated and whether some MWD IVs and Vs were not highly compensated and not similarly situated. As for MWD IIIs, it is not clear whether any, or all, were similarly situated. Overall, the different levels appear to be largely nominal designations applied to junior and senior members of ad hoc teams working together for short periods at different drillsites in different formations. *See Barnes v. Abandonment Consulting Services, L.L.C.*, No. 4:12-cv-01399, 2013 WL 3884198, at *5 (S.D. Tex. July 26, 2013) (denying certification of Rig Clerks in light of the "diversity and complexity" of the offshore oil and gas industry). Nonetheless, some higher-level MWDs appear to have unique executive duties, e.g., filling out Field Assessments.

Given the sporadic evidence as to the executive duties and compensation of each purported level of MWD, the all-or-nothing proposals from the parties, and the running of the statute of limitations until conditionally certified class members opt in, it would be premature for the Court to redefine the class prior to the close of discovery. At that time, Defendants may file a motion to decertify, which should address the possibility that the Court will decertify only part of

the putative class, such as highly compensated and higher-level MWDs, and how the remaining class should be defined. The remaining class should be defined by job titles, salaries, or other undisputed or readily ascertainable characteristics, lest the Court "wade into a thicket of competing factual assertions" before properly addressing the merits of the case. *Cohen v. Lehrman Grp.,* 686 F.Supp.2d 317, 329–30 (S.D.N.Y.2010); *see John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.5 (5th Cir. 2007) ("It is axiomatic that in order for a class action to be certified, a class must exist. . . [A] class must not only exist, the class must be susceptible of precise definition.") (quoting 5 James W. Moore et al., Moore's Federal Practice § 23.21[1], at 23–47 (Matthew Bender 3d ed. 1997). Whether classification by job titles results in a certifiable class depends partly on the outcome of the notice process, whether a manageable group of members opt in, and whether the resulting class would exclude too many suitable members. *See* 1 McLaughlin on Class Actions § 4:2 (11th ed.) (a class should be "ascertainable by reference to objective criteria" but "need not be so finely described, however, that every potential member can be specifically identified"); *In re Deepwater Horizon*, 739 F.3d 790, 821 (5th Cir. 2014), *cert. denied sub nom. BP Exploration & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754 (2014) ("[T]he possibility that some [claimants] may fail to prevail on their individual claims will not defeat class membership.") (citations omitted). Presumably some higher-level members who might opt in began as MWD Is during the class term and may partly qualify regardless of whether higher-level members are excluded.

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Conditional Certification (Doc. 36) should be **GRANTED**, and

**ORDERED** that within ten (10) days of the entry of this Order, Defendants LEAM Drilling Systems, LLC and REME, LLC ("Defendants") shall disclose to Plaintiff the names, last known addresses, email addresses (if available), and telephone numbers of all current and former "drillers and operators employed by LEAM Drilling Systems, LLC and REME, LLC" within the last three years from the date of this Order. This information must be provided to Plaintiff in usable electronic form, if available.

The Court hereby approves the Proposed Notice to Potential Plaintiffs and Notice of Consent attached as Exhibit 11 to the Motion to Certify. Doc. 36-11.

Plaintiff is **ORDERED** to mail and/or email a copy of the approved Notice to Potential Plaintiffs and Notice of Consent to all persons identified by Defendants in 2 response to this Order within twenty (20) days of the entry of this Order. It is further **ORDERED** that Plaintiff's counsel is authorized to send by mail and e-mail a second identical copy of the approved Notice to Potential Plaintiffs and Notice of Consent to all persons identified by Defendants in response to this Order thirty (30) days after the date of the initial mailings.

Defendant is **ORDERED** to post a copy of the Notice to Potential Plaintiffs and Notice of Consent on its company bulletin boards at its office trailers and jobsites for thirty (30) days following the date of this Order. The potential plaintiffs shall be provided sixty (60) days from the signing of this Order to file their Notices of Consent "opting in" to this litigation as Plaintiffs.

Lastly, Defendants are hereby prohibited from communicating, directly or indirectly, with any current or former drillers or operators about any matters which touch or concern the settlement of any outstanding wage claims, or other matters related to this suit, during the opt-in period. Defendants shall so instruct all of their managers. This order shall not restrict Defendants from discussing with any current employee matters that arise in the normal course of business.

SIGNED at Houston, Texas, this 30th day of March, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE